1          IN THE UNITED STATES DISTRICT COURT

2     FOR THE EASTERN DISTRICT OF TENNESSEE AT GREENEVILLE

3     UNITED STATES OF AMERICA,

4          Plaintiff,

5

6     vs                              Case No. 2:18-cr-00140

7

8     ANDREW ASSAD, ET AL,

9          Defendants.

10

11               TRANSCRIPT OF MOTION HEARING

12                      April 3, 2019

13          Honorable Clifton L. Corker Presiding

14     APPEARANCES:

15     For Plaintiff:    T. J. HARKER, ESQ.

16                       WILLIAM ROACH, ESQ.

17     For Defendants:   PAUL M. SISCO, ESQ.

18                       ANN C. SHORT, ESQ.

19                       RICHARD RODRIGUEZ, ESQ.

20                       RACHEL MAY ZYSK, ESQ.

21                       EDDIE SUAREZ, ESQ.

22                       MORRIS PURCELL, JR., ESQ.

23                       GREGORY W. KEHOE, ESQ.

24                       DALE R. SISCO, ESQ.

25                       DONALD A. BOSCH, ESQ.

**Barringer Court Reporting**
**P.O. Box 8035, Gray, TN - 423-477-7844**

        1          MS. OTTINGER:  The United States District

        2   Court for the Eastern District of Tennessee, the

        3   Honorable Clifton L. Corker presiding, is now in

        4   session.  Please be seated.

        5          THE COURT:  All right.  Good morning.

        6          ALL:  Good morning, Your Honor.

        7          THE COURT:  Do you want to call the case?

        8          MS. OTTINGER:  Yes, Your Honor.  Case

        9   Number 2:18-cr-140, the United States of America

       10   versus Andrew Assad, et al.

       11          THE COURT:  All right.  We're here today

       12   on two motions, the joint motion for a Bill of

       13   Particulars and the Motion to Strike the Surplusage

       14   in the indictment, and I guess it's the defendant's

       15   motion to -- who wants to -- do all of you all want

       16   to argue the case, or who wants to go first as far as

       17   the defendants?

       18          MR. FOSTER:  Sir, my name is Todd Foster.

       19   I'd like to go first.  I believe other counsel have

       20   arguments to make as well.

       21          THE COURT:  Oh, that is absolutely fine.

       22          MR. KEHOE:  Yes, Your Honor.  I'm Greg

       23   Kehoe.  I represent Myers, Smith, Alpha-Omega,

       24   Germaine, Zoetic, Tanith and ULD, and I'll be

       25   offering for those.

| | |
|---|---|
| 1 | THE COURT:  Okay.  That's not a problem at |
| 2 | all, and I'm happy to have all of you if you want to |
| 3 | to argue as well after Mr. -- is it Mr. Sisco? |
| 4 | MR. FOSTER:  Foster. |
| 5 | MR. PAUL SISCO:  Yes, Sir. |
| 6 | THE COURT:  Okay.  Mr. Sisco is on the |
| 7 | phone.  Is that right? |
| 8 | MR. DALE SISCO:  There's two of us, Judge. |
| 9 | THE COURT:  All right. |
| 10 | MR. DALE SISCO:  Dale Sisco is on the |
| 11 | phone.  I represent Alpha-Omega Pharmacy, Germaine |
| 12 | Pharmacy and Zoetic Pharmacy. |
| 13 | THE COURT:  Okay.  And, Mr. Foster, you're |
| 14 | representing Peter Bolos? |
| 15 | MR. FOSTER:  Yes, Sir. |
| 16 | THE COURT:  Okay.  That's why I've got my |
| 17 | thing screwed up here.  Okay. |
| 18 | MR. PAUL SISCO:  And, Your Honor, just to |
| 19 | be clear, I'm the other Sisco, Paul Sisco for Andrew |
| 20 | Assad. |
| 21 | THE COURT:  Okay.  All right. |
| 22 | MR. PAUL SISCO:  Thank you. |
| 23 | THE COURT:  All right.  Well, Mr. Foster, |
| 24 | do you want, do you want to be heard? |
| 25 | MR. FOSTER:  Yes, I do.  Good morning |

again, Judge.

THE COURT:  Good morning.

MR. FOSTER:  Well, Judge, in regard to the
Motion for the Bill of Particulars, we all understand
that it's fairly commonplace for as many lawyers and
defendants in many cases, but this case is a little
different.  Actually, it's a lot different, and I
think that the circumstances of this case are more
compelling for the relief that we're requesting.  I'd
like to discuss for a few minutes why I think that is
the case.

Of course, the standard for the Court to
apply in deciding whether or not to grant the Bill of
Particulars is whether or not it is necessary in
order to avoid surprise for the defendants, for the
defendants to be surprised if they are not provided
with the additional information, the detail of the
proceeding, the specifics that they seek.  And in a
case like this with this indictment with the way that
this case is tried, plainly, plainly, I believe that
we are entitled to that.  Well, Sir, if we go through
the indictment, we don't have to go very far really
to make a point.  If we go to Paragraph 1 of the
indictment on the second page, the first thing that
strikes me, jumps out at me is that the indictment

alleges that there are people, the defendants and others known, persons and entities known to the grand jury that are not charged therein. That's not just people. He's not talking about -- the grand jury is not only talking about unindicted co-conspirators, which heretofore the government has not disclosed to us, they're talking about uncharged entities, unnamed, unnamed. So, of course, when we talk about unindicted co-conspirators, there is a whole body of dangerous evidence that comes in from that type of charging language. So we could go to trial, and an unindicted co-conspirator, co-conspirator's statement is offered into evidence, and it's like finding Mr. Bolos who like, "Who's that? We've never heard of this person." Of course, under the rule, 806 for example, Federal Rule 806, we're entitled to present evidence to impeach the credibility of the co-conspirator declarant, but if we don't know who the co-conspirator declarant is, how can we prepare to impeach him or her? So we need to know that unless the government is going to take the position, and I don't expect they will, that they don't intend to offer co-conspirator testimony, co-conspirator hearsay testimony, then I think we need to know that. We need to know who these co-conspirators are,

and we need to know in advance of the trial, far in advance of the trial, and we need to know who these unindicted entities are also.  Because as we go further into the charging language of this document, Judge -- if they're relying on Page 2, it says that "The conspiracy was to deceive tens of thousands of patients," tens of thousands of the patients.  And in the trial, of course, the Court instructs the jury that if you find that the defendant acting in furtherance of the conspiracy on only one occasion, you may find that person guilty of conspiracy.

So here we're getting some vague indication that there are tens of thousands of patient claims which were within the possession and control of the government, and we don't know.  Are they going to put in Number 5, 10, 25, 1,050?  We need to know which specific claims they say are fraudulent so that we can prepare the defendant.  How can we defend -- how can we prepare to proceed with it?  How could we conceivably prepare to defend against tens of thousands of patient claims?  We just can't.  And even if the government would say, "Okay, Little Defense.  Here they are.  We've provided you.  Here's 50,000 patient claims.  You've got them there." Well, okay.  Which ones do you intend to use?  Which

ones do you intend to prove because the cases talk
about that, and some of the cases which were cited
within the pleadings say that in instances where
there's like very, very broad discovery, we're more
entitled to a Bill of Particulars because how do you
pick and choose?  You have 25,000 patient claims
there.  The government has to tell us.  "Okay.  We'll
get this one, this one" or some range.  We're
entitled to some notice so that we can prepare so
we're not surprised when we get to court and say,
"Oh, my gosh.  What is this?"  Entities.  What
entities?  What are the other entities known to the
grand jury which are not charged herein?

          Well, anyway, the government knows who
these -- or what these entities and who these people
are because it says "known to the grand jury."  So
there's a list somewhere in the government's office
where, "Okay.  These are the unindicted
co-conspirators," or "These are the entities which we
think were involved in the trial, but we're not going
to list any of them."  Okay.  Well, if you plead them
-- it seems to me, if you plead them, you intend to
prove them.  So if you intend to prove them, we
should be entitled to notice and the opportunity to
prepare and there's no prejudicial surprise at the

trial.  Now if the government says, "Listen, we're
not going to prove any of that," that's another
story.

THE COURT:  What do you make of their
response that, you know, they have been basically
holding book by giving you all this discovery that
addresses your concern that you're raising right here
about unnamed entities and whatnot and the claims
that they intend to prove?

MR. FOSTER:  Well, it's in this mass of
these -- I don't have any documents, a million
documents or we have thousands of recordings.  So
just because it's in this haystack of information
doesn't mean that we could reasonably and effectively
go through and prepare.

THE COURT:  Why is that?  I mean if that's
what they're saying, this is their case.

MR. FOSTER:  Yeah.

THE COURT:  I mean if they're saying this
is the evidence, and we didn't -- the volume of it is
enormous.  I can see that.  And if they say -- if the
response is, "Well, here is the discovery.  Here are
the other entities, and here's the manner of this
conspiracy, and we're giving you all these documents
that prove what we're trying to -- what we've alleged

1  in the indictment," does that not, does that not

2  answer some of your issues, or does it not?

3         MR. FOSTER:  It's a step, but I think we've

4  done some narrowing down.

5         THE COURT:  So I guess that's the real

6  question, is do you want by the Bill of Particulars,

7  want me to tell them, "All right.  I know you've

8  given them a vast universe of information.  Now I

9  want you to narrow it down to what are you actually

10 going use at trial?"  So you actually...

11        MR. FOSTER:  What are you actually going to

12 use at trial, who are the unindicted co-conspirators?

13        THE COURT:  Okay.

14        MR. FOSTER:  All right.  You've alleged,

15 and we're going to talk about the evidence, and we'll

16 bring it up, and the jury can, the jury can convict

17 people based upon a co-conspirator's statements.  So

18 somebody could take the witness stand and say, "Oh,

19 yeah.  I know Peter Bolos.  A month after the first

20 few with Scott Roix, and he told me, 'Boy, I hope you

21 don't get caught, you know.  This is terrible

22 stuff.'"  And I'm like, "What?  Who's this person?"

23 It's just terribly unfair.  So I think I'll have to

24 know that, and just because the government may have

25 given us the names of that person along with the name

of 200 other people I don't think gets us there.  We
need to know, especially if they're going to rely
upon co-conspirator hearsay.

        Now I'm not saying that they need you to
tell us all the co-conspirator statements which they
intend to get in throughout this.  That's more --
I've not seen that really granted, but by asking, at
least in many districts we've probably throwed the
Middle District horrors.  I came from the Southern
District of Texas before there, and I have seen in
many districts that courts do exercise that
discretion and say, "Tell them who the unindicted
co-conspirators," and some prosecutors do it
voluntarily.  And there's really no harm to the
government, especially, Sir, with your observation
that they say they've already given you those names
somewhere in this mass of discovery.  "Well, just
tell us which ones of the unindicted
co-conspirators they wish no harm," and then we know,
and then we can prepare.

        There is also this item, more than 100
doctors.  So does the government intend to prove
allegations relating to 100 doctors?  Again, if they
do, that's fine, and then we'll know what we have to
do, but if their proof is something less than 100

doctors and it's there anyway, then they'll indict

or as to taking control, we can rely on this pharmacy

or this one or that one for this. I don't

necessarily, Sir, if I'd asked them for their theory

of the case, I'm not asking for a prosecution memo.

I'm just asking, "Just tell us what it is that you

intend to prove. Who generally are you saying are

the people who we should be concerned about so we can

prepare." And respectfully, Judge, I don't think

it's unreasonable.

If we look at Page 4, for example, of the

indictment, Paragraph 8, it's alleged as we come down

Larry Smith used Tanith and its employees to conceal

his ownership. Who's that? So is there going to be

testimony? Presumably, that person is a

co-conspirator. Presumably, somebody is going to

come in here and say, "Oh, yeah, I took all these

steps so I could conceal this place of identity."

Okay. Well, if that person is going to be an

unindicted co-conspirator, we should know who he is.

And it's not that much. It's not all that burdensome

to give that to us. They say so.

Paragraph 37, I'll read. It says,

"Beginning not later than June 1, 2015 and continuing

through the duration of the conspiracy, other persons

and pharmacies known to the grand jury entered into
agreements with Roix." Okay. Who? Because they say
entered into the conspiracy. They came in through
presumably their legal agreements. So that if
they're co-conspirators, and if the jury were to find
they were conspirators, we're clearly responsible for
their acts. So we should have the opportunity to
know who they are so we can defend the case. So that
we can come before this Court and say, "Well, we'd
like to file a Motion in Limine because we think that
this person or this entity or this group should be
excluded for whatever reason under 401 and 403
hearsay rules, whatever."

Paragraph 48, the bottom two sentences, "As
a result, kickbacks from the Synergy principals,"
that's our guy in Larry Smith, Mr. Kehoe's guy, "and
others known to the grand jury."

THE COURT: What paragraph is that?

MR. FOSTER: Paragraph 48 on the bottom of
Page 20, Sir.

THE COURT: Twenty.

MR. FOSTER: The second sentence from the
bottom.

THE COURT: All right.

MR. FOSTER: Starting with "As a result."

1      THE COURT:  All right.

2      MR. FOSTER:  "As a result, kickbacks from

3   the Synergy principals, Larry Smith and others known

4   to the grand jury, were the only source of revenue to

5   help right what is wrong."  Okay.  So there's a

6   kickback allegation in the indictment, and here

7   they're saying that there are other people known to

8   the grand jury during the course of the conspiracy

9   who are also making kickbacks, it is alleged, to

10  Scott Roix.  Well, Scott Roix has been provided as a

11  witness.  They certainly know who these people are,

12  and, Judge, if they're going to charge us with it,

13  they should tell us what it is so we can defend it.

14      Judge, one of the drives to discovery that

15  we received, it's got I think hundreds of thousands

16  of recordings of patient calls.  Okay.  That's

17  terrific.  So do we have to listen to the thousands

18  of recordings if the government could say, "Okay,

19  Guys.  You know, we intend to use maybe -- listen to

20  these 300 - right? - without the other 2,500."  Okay.

21  Just some direction, just some direction.  We are not

22  asking for their theory of the case.

23      There's something else that strikes me in

24  this case is that if this was a civil case, we could

25  proffer Interrogatories and say, "Who are these

people?" Right. "What are these doctors?" And we'd
get it. It's like commonplace. Nobody needs to talk
so much, and you get it. And there were items about
money, and here we're fighting for freedom because
the numbers in this indictment are astronomical.
It's just astronomical, and when there's so little
burden to the government to provide us what we're
asking and it really will help us avoid surprise and
be able to effectively defend our clients in this
case, it's really in light of anything, Sir.
It's really something which merits the exercise of
your discretion to compel the government to provide
this.

There's something else, and I've read a lot
of the transcript, the transcript of the other
hearing before the Court, and something else that's
like a real issue in this case, and I guess it'll
come out in the severance motion. The way this
conspiracy is wrought, and I know in the pleadings
there's a reference to the Katiachis (phonetically)
case. This is a very, very troublesome conspiracy
allegation. So you have Mr. Smith's vertical, and
then you have the Synergy vertical. These people
don't know each other. These people don't know each
other. They don't do business with each other.

They're competitors.  So you have a hub, which is
Scott Roix, but what the case is, Katiachis, and I
found a, I found a district court case from the
Nashville Division, *United States versus Adan*,
A-d-a-n, and the cite is 913 Fed. Sub. 2nd, 955, 913
Fed. Sub. 2nd, 955, and that was a reversal of a
conspiracy prosecution because there, like here, you
have these two verticals where they don't have a
common goals.  You don't have injured defendants, and
it's not a properly charged conspiracy.  It is a
multiple conspiracy.  It is a rimless conspiracy.  So
if this case were to go forward to a jury where we
have this rimless conspiracy where all this business
is going to be charged -- or proven, rather, related
to Mr. Smith, and we don't know really who any of
these people are and all of this is going to be
proven concerning our people and they don't know
really who we are and the jury is going to be told,
"Well, you know, there are 194 -- it's almost a
billion dollars in false things here, Ladies and
Gentlemen, and these people are responsible, and if
they're looking for a few acts -- you know, he's
charged in conspiracy with Larry Smith," that would
be -- you know, it's like -- it seems to me like he's
involved.  It's just, it's just so treacherous for us

given the length of time, three years, the amount of
claims, the amount of entities, the amount of
patients, the amount of doctors.  I do not want any
unindicted co-conspirators (inaudible).  I know that
Mr. Roix, who pled guilty, his family worked for him
at HealthRight.  So are they co-conspirators?  It'd
be good to know.  Right?  Are they going to testify?
Okay.  We're not (inaudible).  Just let us know how
we can -- And the fact that we may get a witness down
the road, that's good.  That's great, and that's
something that is greatly appreciated by the
government's offering to do that, but in this case
with the trial date still a year out, it would be
especially helpful to us to have access to that
information now so we could prepare a more meaningful
motion and more meaningful preparation and just make
everybody's job easier.  Thank you, Judge.  Unless
you have questions...

THE COURT:  No.  I think you've covered
that very well, and I've read the briefs in this
case, which were very well written, too.  All right.
Who wants to argue next?

MR. SUAREZ:  Thank you, Your Honor.  Good
morning, Your Honor.  Eddie Suarez on behalf of
Michael Palso.  Your Honor, I intend to be very

brief. I just want to supplement the presentation

Mr. Foster made on behalf of the Synergy principals,

Mr. Assad and Mr. Palso and Dr. Bolos.

Your Honor, to put some of Mr. Foster's

comments in a little bit of context, I want to draw

your attention to look at the Court's chronology and

the size of the discovery. We know -- and there's

been a little bit of back and forth. I think one of

the footnotes in their response in opposition to our

Motion for a Bill of Particulars, the government

acknowledged that they represented as seven terra

bytes of information initially, and they have now

determined that a significant portion of that is

roughly five or six terabytes that they have deemed

to not be relevant or they also claim that it has not

been reviewed by them. So that's probably something

for another day, but I think that we all agree that a

terabyte document that has now been produced, and I

think it's important to sort of conceptualize that or

to frame it in terms of things that at least those of

us lawyers of a certain vintage understand or can

grasp a little clearer. That is, what doe that

mean in terms of paper because that's what at least

I'm used to dealing with.

And so I went to a number of discovery

websites just to get some numbers, and some of those
we put in our motion.  In terms of worded documents,
we're talking about 86 million pages of documents.
So when Mr. Foster talks about some of their
questions that we have that need answered in order to
properly prepare the defendants' case, it's not as
simple as saying read 86 million pages in the next
365 days, and you'll have your answer.  That is just
an unsurmountable task.  It's just not realistic and
cannot possibly lead to a just resolution, which is
why I think we need some assistance from the Court in
terms of directing the government to give us a
response in the way of a Bill of Particulars.

I want to -- they just had one example, a
factual example to what's in our motion and to Mr.
Foster's presentation, and that is the amount of
money the government is alleging.  So in the
indictment in Pages 1 and 2 of Document 1, the
government alleges that there is $174 million that
was obtained by the conspirators and in false claims
submitted to the tune of $931 million, almost a
billion dollars.  Then in their response to our
Motion for Bill of Particulars, Document 110 on Page
2, the government says that the Synergy defendant
received approximately $77 million and that Mr. Smith

1    and those entities received approximately $24

2    million.  Well, if you add those two numbers up, you

3    get somewhere in the $111 million or $112 million,

4    which leaves a significant gap from the $174 million

5    that's alleged in the conspiracy.  So just to keep

6    the numbers simple, there's about $70 million that's

7    missing by the number alleged by the government in

8    the indictment, and we have no idea where that money

9    went.  Who is it that received that money?  And where

10   we stand right now, and presumably the government's

11   direction was, is look to the 86 million pages that

12   we provided you in order to find that answer, and

13   then I go back to our -- that is just an unreasonable

14   and it's an undoable task for us to do.  So with

15   that, Your Honor, I'll sit down, and I thank you for

16   -- unless you have questions.

17           THE COURT:  So your concern is with

18   respect to the amount?  It's the identification of

19   this other seventy some million dollars obtained by

20   these other co-conspirators?  So you would like me to

21   order them to give you that information to explain

22   where they come up with the 174 so that you can say,

23   "All right.  Here's the 174.  This is attributed

24   Synergy 77, Smith 24, X, you know, another 77."

25           MR. SUAREZ:  That's right, Your Honor.  It

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

19

```
 1    really coincides with Mr. Foster's request, and we

 2    have no idea who these other co-conspirators are, and

 3    so we have this universe presumably of

 4    co-conspirators that presumably, I'm guessing, is

 5    where this missing $70 million is.  I really don't

 6    know, but that would seem a logical conclusion.  So

 7    we have this significant pool of money.  We have no

 8    idea who it went to, and we have no idea who those

 9    people are and they're alleged to be co-conspirators

10    with, who presumably gained this significant amount

11    of money that we have no clue.  So in essence, yes,

12    that is exactly what -- the identity of those

13    individuals and the money that they allegedly made is

14    among the things that we think would be appropriate

15    for us to understand.

16              THE COURT:   Okay.

17              MR. SUAREZ:  Thank you, Your Honor.

18              THE COURT:   Thank you.

19              MR. KEHOE:  Good morning.  Greg Kehoe on

20    behalf of Mr. Smith and Tanith and ULD and also in

21    summary Alpha-Omega, Germane, and my co-counsel, Mr.

22    Dale Sisco, who is on the line and is invited to get

23    into anything with the Court's permission I think in

24    the argument...

25              THE COURT:   Okay.
```

MR. KEHOE: ...and I will potentially
address all of those, which is (inaudible)
at the outset. I know Your Honor from the arguments
on the transfer, know that he said that he didn't
(inaudible). I mean this is a unique case, and when
we look at a Bill of Particulars generally --know
Your Honor is well familiar with the case law, that
some Bill of Particulars are granted, motions are
granted in certain cases, and some are not.
(Inaudible) Bill of Particulars is not granted, and
the case law is replete in that regard. When it
became more sophisticated or more complex as Mr.
Harker has defined this case that had a nationwide
scope with thousands of people involved, the
complexity makes it much more difficult to defend,
extremely difficult to defend.

We have a scenario here where there are
conspirators known to the grand jury that none of the
defendants theoretically have ever met, don't know
anything about, are in Florida, are in Tennessee,
doctors. I think that there were 100 doctors listed
that were supposedly deceived. Where are they? Are
they here? Are they in California? Are they in
Florida? And how about the doctors who are
complicit? You know, there are two doctors, doctors

that are described by the government, some who were
deceived and some who were complicit.  Who are they?
Are they co-conspirators?  Are they co-conspirators
known to the grand jury, and where are they?  As far
as defending the case goes with the folks that are to
my right and behind me, we have an obligation
technically as Your Honor knows is to defend to the
best of our ability.  And how are we supposed to
defend this vast array of potential co-conspirators
if we don'tknow who they are?  As Your Honor knows,
under Rule 801(d)(2)(E) of the Federal Rules of
Evidence, we're entitled to, of course, impeach the
credibility of a declarant, albeit that declarant is
not important.  How are we conceivably supposed to do
that?  We have no range of knowledge of almost any
number of -- any number of co-conspirators that are
out there.  It's just impossible to get your arms
around it.

          And it's not helped by a variety of other
factors, Judge.  I mean with regard to the conspiracy
itself, the dates, the location of the formation of
the conspiracy.  The conduct in furtherance of the
conspiracy is very vague in addition to the various
unnamed actors and conduct that they have
participated in.  When you overlay all of that

complexity and unknown on the fact that not only do
we not know who these co-conspirators are, these
defendants didn't even know each other.  We move into
an area of extreme difficulty, and the one thing that
Rule 7 is supposed to evade, which is surprise at
trial.  I mean  isn't that -- that's really why we're
here, Judge, because at the end of the day no one
wants to be surprised at trial as to what is going to
be brought before a jury of twelve.  And the way we
have the landscape right now it's impossible to know.
You weigh that data upon facts, circumstances and
involvement on the issues concerning what's illegal
and not illegal.  I am somewhat baffled by some of
the arguments that have been advanced by the
government using language like -- and I know this is
some degree in the surplusage of argument, using
language like advanced AWP, you know, average
wholesale price.  What is that?  They throw this
around like it's, you know, sewer gas.  It makes a
lot of noise, and it looks terrible. I think what is
that?  I mean I think one of the things even for the
Court, if you're going to use this in some area that
shows the complicity of all of these individuals
allegedly doing nefarious things, please give us an
idea of what average wholesale price, average whole

price is, given the fact that these defendants had
nothing to do with setting the average whole price,
nothing whatsoever. And, of course, I can't keep
talking about this at some length during the transfer
hearing. This use of the Florida statutes, that
would be kind of just like jump some Florida statutes
into the indictment, and the argument that I think I
heard from Mr. Harker - I may be wrong. You guys can
correct me - was that, "No. We want to make sure
that there's an advice of counsel defense," all of a
sudden shot that little thing in there, but we really
don't expect a juror to have to understand Florida
statutes. So, you know, we haven't just put it in
there to prevent that defense. Some idea, Judge, of
what the government's position is of that given that
this is an indictment leaves most of us, you know, in
the dark without some further explanation. And we
can talk about that to some degree, and if I could
just touch on that as I go through this chapter and
verse, Judge, later on as well as the briefs in this
matter and discuss -- excuse me, and thought through
the competing arguments that have been laid out. I
think the first at the outset is the discovery here.
Obviously, we were given, additionally given seven
terabytes of information and now there's something in

-- Mr. Harker said now there's something in error,
one terabyte, which don't ask him he bases that is,
but I can tell you one thing - it's a lot, and
through that we're supposed to decipher through
exactly what's pertinent and what's not.  And he
likewise argues that this was, you know -- I believe
that he argued that it was discoverable.  It was easy
to wind your way through and find out exactly what
was going on.  With all due respect to my learned
friend, Mr. Harker, frankly nothing is further from
the truth.  If you look at the first hard drive,
there are 634 files, 634 in just the first hard
drive.  None of it's OCR, and you have to go
literally through each individual file to find out
what's in it.  The data is not searchable.  I don't
know how, and maybe the government's got a different
searchable system than the rest of us, but I don't
know how that we -- and we can argue that files like
this are searchable, but nothing is OCR.  It makes it
extremely, extremely difficult.  So you end up having
to go through this maze to try, Number 1, to get it
open and, Number 2, to figure out where it fits into
all of this.

            THE COURT:  So what I hear you saying is
that the discovery may have been given to you that

may address a lot of these things, but the way in
which it is presented, it is, it is an enormous
burden to go through because of the number of files.
It's not searchable, and it's kind of like -- is it
not organized?  Is it just a...

            MR. KEHOE:  There was no way.  When you go
in to see the file, then you tell me, Ladies and
Gentlemen.  Correct me if I'm wrong.  The files are
not listed.  They're not described.  They're just
files.  In the first, in the first typed part, it
says 635.  There's no idea what it is.  It's just
this array of stuff that's in there, and it's
equivalent to the old days, Judge, of when we harken
back to trying cases many years ago where, you know,
the government would tell the defense lawyer, "Here's
a warehouse full of stuff.  Your stuff is in there,
and have at it," and kind of figure out what you
need.  So that likewise meets the argument, "Well,
oh, in fact, we turned everything over," but, you
know, you spend the basic part of your adult life
over the course of several years to try to look at
it.  Suffice it to say, Judge, the rules don't
contemplate that.  Certainly, Rule 7 doesn't
contemplate that.  It contemplates a rational
approach to discovery to allow the ladies and

gentlemen to my right to do -- to perform their
ethical jobs, to meet their ethical standard and
defend their clients, and when they walk into a
courtroom, no one is surprised at trial about pieces
of evidence and the array of matters that the
government is disposed.  The way it is right now
there is no way to get your arms around this without
literally spending hours and hours and hours between
now and next April to do just that, and I just -- I
submit to Your Honor that the rule doesn't
contemplate that.  The purpose of Rule 7...

THE COURT:  What do you want me to do -
just order them to identify the specific items of
evidence?  Is that what you're asking me to do is...

MR. KEHOE:  I think the government thinks,
Judge, consistent with what colleagues have said is
it's not like identification of, you know, what --
who are these co-conspirators that are known to the
grand jury?  That will at least give us some idea of
who is pertinent in this array of documentation and
who is not.

The second thing is, is there's -- I
assume, I assume that the government has this
documentation and is going to employ that, use that
documentation during the course of their

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844
27

Case 2:18-cr-00140-JRG-CRW   Document 125   Filed 04/22/19   Page 27 of 95   PageID #: 1191

investigation or in trial; that they have some theory

as to where all this information has to go or what is

it.  That's not asking them for a theory of the case,

but it's just asking, you know, identify what is on

all of these files?  Why is this stuff pertinent as

opposed to just turning to it and say, "Here it is."

THE COURT:  So you want them to go through

each of the files and say what's perking?  Is that

what you want me to do?

MR. KEHOE:  What I'd like, Judge, is to

maybe go through these files and when you open up the

634 files, what's in each one of those 634 files.

Are some of them irrelevant, of no consequence?

What's in the 634 files?  That's the only...

THE COURT:  And you can see what's in it.

Right?  You can open up the files?

MR. KEHOE:  You can open up a file, and you

-- you can open up the files, and there is -- you

open up a folder, and within that folder there are

files.

THE COURT:  Right.

MR. KEHOE:  I mean you can do that.

THE COURT:  I mean I don't know.  I don't

-- I haven't been given discovery, and I haven't

looked at discovery.  I just want to -- I want to

make sure I'm understanding the way in which the
government has provided you all with information.
That's my issue.  And if I hear you say you can't
even see what's in the file or we don't even know
what's in the file or what's pertinent or we don't
know anything about it, that tells me something -
that maybe -- are you not -- is it not -- are they
not giving you the stuff that you can actually look
at, or is there...

        MR. KEHOE:  You can't search in it.

        THE COURT:  You can look at it, but you
can't, you can't search it, or is it not openable or
what?

        MR. KEHOE:  It's openable.

        THE COURT:  Okay.

        MR. KEHOE:  It's openable.  I don't even --
let's look at where you start.  You start with seven
terabytes.  That was handed over to us.  That's an
enormous amount of information.

        THE COURT:  Right.

        MR. KEHOE:  I assume that was given over to
us because the government wants some flexibility,
that within that seven terabytes of information they
can say should they decide to use it, "We gave it to
you."  That's Number 1.  That's a tremendous amount

1     of information.

2             THE COURT:  They've reduced it down to one.

3     Right?

4             MR. KEHOE:  For all intents and purposes,

5     Judge.

6             THE COURT:   Okay.

7             MR. KEHOE:  If, in fact, we get to trial,

8     are we limited to that one terabyte of information?

9     Is that a stipulation, that we're not going to use

10    any documentation or information or anything other

11    than that?  Because if that's the case, of course,

12    you know, we'll ignore the six terabytes that they're

13    not going to get involved in.  But that -- if that's

14    not the case, then we're still being -- it's

15    incumbent upon us to find out what's in that.

16            The second thing is, Judge, I assume the

17    government has got some methodology to search these

18    files.  In the first -- you know, in the first hard

19    drive we received, do they OCR this stuff?  I mean

20    was it, in fact, searchable?  If I put Larry Smith

21    down in there, I can't search these files.  And this

22    is something that is almost the standard in a civil

23    case, not almost the standard.  It is the standard.

24    I'm sure that every case that comes before Your

25    Honor, you know, it has to be in searchable function

in the discovery that's given or no cases would move
promptly through.  This is really -- we're not asking
for something that is extraordinary here.  We're just
asking for some methodology to give us some notice so
we can, you know, properly and efficiently use our
time to address the discovery that's before us.  And
then I've been saying, Judge, these issues are not
necessarily independent of one another.  When you're
going through this, if you have an ID of who, in
fact, for instance, if you know who the conspirators,
co-conspirators known to the grand jury are, it makes
your searches, of course, significantly more narrowed
and more efficient, and you know what you're looking
at, but now, because we didn't even know that, we're
still in the dark as to what this -- who these names
are in some of these documents.  It's a very
difficult proposition, Judge, and it is not something
I would say, Judge, that was handed to the Court and
asked for a Bill of Particulars every day.  So this
is a different, complex case over a significant
period of time, over a significant geographical area
involving millions and millions and millions of pages
of records, and we're just asking for some type of
help from the Court so we can navigate through this
and get some clarity as to what the government's

position is, not only on who is involved, but also, you know, what documents are pertinent to this.

THE COURT: Well, that's my question, and then you said you want to compel the government to identify the co-conspirators, and as far as all the documents are concerned, you'd like for them to give you files that are searchable.

MR. KEHOE: Yes.

THE COURT: Right? And then identify which specific files that they intend to use.

MR. KEHOE: Well, Judge, if, in fact -- if, in fact, we're not involving ourselves in six terabytes of information and we do not have to worry about it, is that the clear position that the government is taking in this matter; that the only pertinent information is on one terabyte of information, which -- I say one terabyte of information link. It's not warehouses full of information. It still is. It's not clear to me that that's the case, but it has to come up with some type of -- we have to come up with some type of remedy, Judge, where when we're going into trial and the government -- the defendants aren't shocked by, A, some defendant that -- some co-conspirator that comes in that they've never met, they don't know anything

about, and we know that there's a distinct
possibility that given the fact that these defendants
didn't know each other and they're not going to be
taken by surprise and that these defendants are not,
you know, convicted on some co-conspirator statements
made by someone that the government alleges was in
furtherance of a conspiracy in another place and
another time that they don't know anything about.
It's just asking for additional information to
clarify where the government is coming from.  And the
government's answer to all of this, Judge, is, "Oh,
it's all in the indictment."  Well, you know, Judge
who's -- I have a simple question.  Who's the victim
in this case?  Is it TriCare?  Is it the federal
programs?  Is it the PBM's?  It was a horrendous
warning that we were talking about individual
customers.  Who is it?  I mean what -- to go on, what
are inflated AWP's?  In Paragraph 43 they make
allegation that employees were instructed to engage
in test billing.  Who?  Which defendant?  Mr. Smith?
Mr. Bolos?  Who?  I mean who created this list of
inflated AWP medications, and as I said before, who
are the doctors that were receiving it?  Who are the
doctors that were complicit?  The government's answer
to all of this is, "Read the Complaint."  That's not

1    helping, Judge.  That's not helping.

2            My question, Judge, at the risk of

3    repeating myself, we've also asked for some clarity

4    to understand exactly what the government thinks is

5    relief, not the least of which is the recitation of

6    the Florida statutes.  Putting aside the fact that

7    this is clearly two conspiracies, two -- looking in

8    the light most favorable to the government, this is

9    two conspiracies and not one.  These defendants

10   didn't know each other.  If you look at Paragraph,

11   you know, 32 of the indictment, it says that all of

12   these defendants knew -- agreed to operate together.

13   Well, they didn't even know each other.  God knows

14   what the evidence is concerning people who -- we

15   don't even have their name on the radar screen here.

16   There's got to be some additional clarification as

17   to, putting aside some clarity of what the government

18   is saying is illegal, some idea of equal events,

19   locations and what the government is going to, going

20   to advance during the course of this case so a

21   defense can be prepared.  It is what Rule 7 requires.

22   It does not permit the government to just venture

23   into a variety of different areas and pick and choose

24   what they want and then decide when it comes trial

25   time, "This is what we're going to advance in front

**Barringer Court Reporting**
**P.O. Box 8035, Gray, TN - 423-477-7844**

of the jury," not even talking about when we get -- I
mean this whole thing about money laundering, this
whole theory that the money laundering is an
intricate part of this conspiracy, albeit the
government never tried -- never charges a 1956 or a
1957 charge under Title 18, probably because they
didn't get off probation for the money laundering
section in Washington, but be that as it may, they
throw around that argument, this idea of money
laundering, and it's clearly a prejudicial argument.
You know, but we're having to talk about that in the
Motion to...

       THE COURT:  Well, that's not in the Bill
of Particulars?

       MR. KEHOE:  That's not in the Bill of
Particulars.

       THE COURT:  Okay.

       MR. KEHOE:  But it does goes to the theory
that the government is advancing here as to what is
legal or illegal.

       THE COURT:  Okay.

       MR. KEHOE:  Who is supposed to be the
victim here, Judge, and what are these other statutes
and other comments that they advance, how are they
somehow part of this criminal theory, and do I take

them off the top of my head?  Are they inflated

AWP's, which don't exist, and also they use the

Florida statute.  And what we're looking to, Judge,

is some indication or some additional clarity on some

of these positions just to help us prepare and not

be, you know, surprised at trial.  And I think that

at a minimum, Rule 7 contemplates that.  I don't know

if my colleague, Mr. Sisco, Dale Sisco, the good

looking Sisco, who is on the phone, has anything

further to add.  If I could just turn to him for a

moment and ask him if he does.

          MR. DALE SISCO:  No, thank you, Judge.  I

think it's been well covered by Mr. Kehoe.

          THE COURT:  Okay.  All right.  Very good.

          MR. SUAREZ:  Your Honor, would the Court

permit me to add a little bit on some of the

questions that you asked Mr. Kehoe, particularly with

the condition of the discovery that was provided?

          THE COURT:  Yeah.  You can address that.

          MR. SUAREZ:  Thank you, Your Honor.  It's

Eddie Suarez.  I'm here on behalf of Mr. Palso.  Your

Honor, I spent a significant amount on time to the

discovery part I understand was there, and I think I

can explain to the Court in a manner that'll make

some sense.  So, for example, if you were going to

read the reports introduced, which what we generally
refer to as 302's, there is a -- there's one hard
drive.  There is largely a folder in which those
reports of the interview are contained, and they are
-- once you open that, what you will find is a series
of folders that are divided by agency.  So for
example, the reports that were generated by the FBI
will be in one folder.  The reports that were
generated by the FDA will be in one folder and so on.
There's a series of folders divided by agencies, and
when you open that folder, you get a plethora of
individual files that would be the interview done
with Mr. Percell and the interview done with Mr.
Sisco and the interview done with these countless
witnesses in the case.  There is no way if you
wanted, for example, to read the reports of interview
of Scott Roix, the head of HealthRight, who is a
cooperating defendant -- you would not be able to go
into these four hard drives and enter the name Roix
and somehow be able to figure out where he is in this
over one terabyte of materials.  There's no mechanism
for doing that, and so you would have to open up
every folder, then look at the list of the file names
in the reports of interview, hope that the creator of
that file include Mr. Roix's name in the file and

say, "Okay.  There's a report from Mr. Roix," open
that and read it and likewise go through that
process.  So I hope that helps a little bit for the
Court to visualize how the discovery is organized.
There is no master index, and by index, I don't mean
the stuff you find in the back of a book.  As you
know, computer programs go in, and they sort of
search data, and they create a computer index, which
then in a particular application can go find
documents.  That doesn't exist in the way those have
been turned over to the defendants.  They're all
individual files, and then, you know, Mr. Foster had
suggested many of these files have not been OCR'd.
So they're not searchable.  Once you open a file, you
can't even search within that file.  So I hope that
helps the Court understand a little bit.

You also asked questions about specifically
what relief we are requesting, and, Your Honor, in
Exhibit A of our motion, we sort of gave you like a
giant menu.  Our thought would be that after you
heard the arguments, if some of our requests seem
reasonable to the Court, then you could select from
our giant menu those that you felt were appropriate.

THE COURT:  Okay.

MR. SUAREZ:  Thank you, Your Honor.

1    THE COURT:  Thank you.  All right.
2    Anybody else want to be heard at this time for the
3    defendants?
4            ALL:  No, thank you, Your Honor.
5            THE COURT:  All right.  Mr. Harker, do you
6    want to be heard?
7            MR. HARKER:  May it please the Court, I
8    will respond to the Motion for a Bill of Particulars,
9    and Mr. Roach will respond to the Motion to Strike
10   Surplusage.  Your Honor, if I could have the overhead
11   projector, please.
12           THE COURT:  You can have what?
13           MR. HARKER:   The overhead projector,
14   please.
15           THE COURT:  I think it's on.
16           MS. OTTINGER:  It's not on?
17           THE COURT:  Does it not work?  I see it's
18   is on.  Can the defendants -- each of you all see th
19   this?
20           ALL:  Yes, Sir.
21           MR. ___:  Do you have a hard copy for us?
22           MR. HARKER:  Okay.  Now this a copy.  Now
23   this is a (inaudible) document.  When we first
24   addressed the issue of the organization of
25   discovery...

**Barringer Court Reporting**
**P.O. Box 8035, Gray, TN - 423-477-7844**

THE COURT:  Let me ask you.  Your
contention is that the Bill of Particulars is not
necessary based on your supplying all the discovery
information that we're going to talk about right
here?  This -- as a general rule, you're saying from
when I let in your response is that, "We have
answered every one of their questions  given the
documents and the information we have provided in the
terabyte of information"?

MR. HARKER:  Your Honor, the bona fide
questions, that is correct, our interest in that.

THE COURT:  Okay.

MR. HARKER:  There are other questions that
are answered in the discovery in a way that is easily
searchable.  You can find that right in front of our
papers.  I'm happy to discuss that right now.

THE COURT:  Uh-huh.

MR. HARKER:  So you have the ability that
is not necessary.  It's not an appropriate use of
ability just to try to extract the government's...
And an important point that both Mr. Foster and Mr.
Kehoe mentioned was the need to identify particular
documents that the government is going to use.  The
Court has already addressed this.  The government has
agreed -- this is the Scheduling Order.  Beginning on

July 10th, 2009 the government will begin enrolling
identification and production of (inaudible) trial,
and the deadline for that production is February,
more than two months before trial.  In other words,
they will have every exhibit that we intend to
provide and use in our case in chief at trial at
least sixty plus days prior to trial and in some
cases a hundred plus days in advance of trial, 180
days in advance.  So if they're concerned about
volume of evidence, which they shouldn't be for
reasons I'll get into, the Court has already
addressed that issue.

One of the things that counsel for the
defense raised in their argument was the amount of
money at issue in this vast array of unindicted
co-conspirators, how can the defendants know who the
other unindicted co-conspirators are.  They're
worried they're going to be held accountable for the
conduct of other co-conspirators, who they don't
know.  Now, Mr. Roix, he's a co-conspirator.  They
know his identity and the company HealthRight.  I
point out in the indictment that $114, $113 million
are directly attributable to the conduct of these
defendants, not unindicted defendants.  That's $114
million of approximately $174 million.  $174 million

is the allegation set forth in Paragraph 1, and the

remaining $114 million is broken into three parts,

about $78 million attributable to Synergy as set

forth I believe in Paragraph 85 of the indictment.  I

may be off by a paragraph on that.  Another $11

million attributable to a sitting group of

pharmacies, in other words, Synergy, in that same

paragraph, and another approximately $25 million

attributable to Alpha-Omega set forth in Paragraph 80

of the indictment.  It's not these defendants that

should be worried about other co-conspirators.  It's

those other unindicted co-conspirators they should be

worried about, Your Honor.  They have the 60 or 65 or

whatever percentage that is of the conduct in the

conspiracy that is charged in this indictment.  But

they also know exactly how these numbers are

tabulated because if you go into this folder right

here, Reports-FBI, there's a sub-folder that says

something to the effect of Reports of Forensic

Accountants-FBI Forensic Accounting VM, and in there

it's all the information.  It tells exactly how these

numbers are calculated.  It's searchable.  Those are

direct, printed pdf. files in there and in

self-terms.  If you go to the highest level directory

on this folder -- this is a printout, Your Honor,

I'll represent to the Court, of the government's

version of this evidence, which is almost identical

to the version they have.  For some reason, we had to

break some of the audio recordings into a separate

file to copy them, in fact, but this is almost

identical to what they have.  For all material

purposes, it is identical, and I'll represent that to

the Court.

             THE COURT:  So it is searchable?

             MR. HARKER:  Yes.  Yes, Your Honor.

             THE COURT:  They're saying it's not

searchable.

             MR. HARKER:  So, Your Honor, let...

             THE COURT:  Am I misunderstanding?

             MR. HARKER:  I think the misunderstanding

arises from a couple different sources.  This is from

the government's brief, and it's not in color here.

             THE COURT:  Right.

             MR. HARKER:  This is 1.4 terabytes of data,

and that's a fair amount of date.  It's in the top

here consists of 31 gigabytes of the main case file.

This 31 gigabytes is more or less these six pages

right here...

             THE COURT:  Okay.

             MR. HARKER:  ...in the response -- it's put

on this in response every single entity of the
government's unit, who it pertains to, all
pharmacies, Synergy, Bolos, Boyd, Synergy,
HealthRight, Precision Pharmacy Management.  Those
are all in that, page after page of well-organized
discovery.  That's the 31 gigabytes.  That's the
essential part of the case file.

          Now, Your Honor, there's this large section
over here, probably three-quarters, 75 percent
approximately of the discovery, which consists of the
HealthRight material.  In terms of bytes, the bulk of
that are audio recordings and electronic
prescriptions,  hundreds of thousands of these audio
recordings.  The defendants claim that they can't
search that material, and they wrote in their brief
that the manner of explaining and searching that
material is some indecipherable key known only to the
government.  I'll represent to the Court that on a
call with all the defense lawyers in December I
explained the technique.  I'm going to do again right
now.  This is Exhibit Number 1.  The defendants have
a copy.  I printed this out this morning.  The
defendants have an Excel chart of both pharmacies,
Synergy and Alpha-Omega.  It's got tens of thousands
of rows.  Let's say you wanted to find the audio

recordings for this patient picked at random. I will

say the patient's name. It was transcribed.

Everybody can see the patient's name.

THE COURT: Okay.

MR. HARKER: You could also pick the

patients who are identified in Counts 2 through 32 of

the indictment. You pick that. They know who they

are, but if they want to know the -- if you need

magic in the decipherable key, it's the patient's

phone number right here. You then go to the folder

that has the audio recording. This is the bulk of

the evidence, hundreds and hundreds of gigabytes of

audio recordings. There they are. They've got this

indecipherable number, and I apologize. I should

have expanded the column here so you could see the

full file on that. If they go to "Search File" in

the top right and you put that phone number of that

patient right in there, and wallah! That's the type

thing that the government has to search these files.

There is no special other computer system that we

have. All of the evidence, all of it that the

government has obtained it has delivered to the

defendants in either the same form that they got it

or a much well or better organized one, all of it,

except for one exception. All the evidence that came

from Synergy, all of that is much less searchable by us, and that's about 25 percent of it. Those are their emails, their pharmacy software. There are response records. Our ability to search those items is substantially less than their ability to do so. So, Your Honor, the discovery is extraordinarily well organized. Any item or method that they watched they can find at an easily or more easily than the government can. The idea that there are 86 million documents here is simply a farce. That's not what we're talking about. The documents are contained in this 31 gigabytes of files. Everything else, the audio recordings except the defendant's, Synergy, files or HealthRight emails. Those HealthRight emails are provided in Outlook psd. format, which is searchable. You simply open it up using your technology vendor or your own Alpha machine, and you search the same way anybody would search Microsoft Outlook. And that's what the government does. That's what they can do here.

Now let's go back if I could retroactively, Your Honor, and mark those Exhibits. This could be Number 1, and then those three printouts of the screen shot, I'll just call that -- this will be Number 2. I apologize for this, Your Honor. I put

1  this together this morning.  This one will be Number

2  3, and this one will be Number 4, and I'm missing an

3  exhibit sticker for Number 1.  So I'll just write

4  Number 1 here on the file, and the defendants all

5  have copies of these.

6              THE COURT:  Okay.  All right.  Let it be

7  -- do you want to admit those?

8              MR. HARKER:  Yes, Your Honor.

9              THE COURT:  All right.  Let that be

10 admitted.

11

12             (WHEREUPON, Exhibit No. 1, Excel Record and

13 Key, Evidence Folder Contents, IS FILED.)

14

15             (WHEREUPON, Exhibit No. 2, Three printouts

16 of screen shots, phone numbers, IS FILED.)

17

18             (WHEREUPON, Exhibit No. 3, Subpoena,

19 Synergy Recordings, batch 8, IS FILED.)

20

21             (WHEREUPON, Exhibit No. 4, Synergy

22 Recordings, Batch 8 (3166485998), IS FILED.)

23

24             MR. HARKER:  Your Honor, during that phone

25 call in December when I represented to the defendants

and I explained this process, I said, "If you don't understand this now, feel free to call me." That was December. I haven't received a phone call.

It seems to me that they're primarily concerned about two things - knowing what our trial exhibits are going to be and knowing who the co-conspirators are. They know or will know what our trial exhibits are going to be. They'll know what those are beginning in July and ending not later than approximately February 3rd according to the Court's Order. The Court's Order, Your Honor, which the defense and the government negotiated, we negotiated those deadlines. By implication then those deadlines were acceptable to them for the purposes of preparing for this trial.

Also they've asked to receive co-conspirator statements. Again, the Order on this case provides Notice Required. The government intends to introduce co-conspirator statements under FRE 801(b)(2)(E). We have to send those seven days in advance of trial. And that's it.

THE COURT: What do you make of their argument? It looks like every one of them -- every one of the lawyers claim that they just don't know who these co-conspirators are, and, you know, they

```
 1    are completely in the dark regarding that.  What's

 2    your response to that specific problem they are

 3    saying?

 4              MR. HARKER:  Your Honor, the indictment --

 5    as I said earlier, the indictment alleges that

 6    approximately $174 million was obtained and that

 7    these defendants specifically obtained -- actually

 8    obtained about whatever $114 million is divided by

 9    $174 million.

10              THE COURT:  Right.

11              MR. HARKER:  Maybe 60 or 65 percent.

12              THE COURT:  Right.

13              MR. HARKER:  Those other co-defendants,

14    clearly the primary person is Scott Roix.

15              THE COURT:  Right.

16              MR. HARKER:  Now I'll represent to the

17    Court that one of the things that the government

18    intends to show is that mechanisms that were employed

19    by one of these groups of defendants...

20              THE COURT:  Uh-huh.

21              MR. RIGHT:  Right.  In furtherance of the

22    fraud, were then adopted by their co-conspirator,

23    Scott Roix, and pushed out to the other co-defendant,

24    not the unindicted co-conspirators.  They may also

25    had been a part of it but these co-conspirators
```

1   here...

2            THE COURT:   Okay.

3            MR. HARKER:   ...in this courtroom.

4            THE COURT:   Okay.

5            MR. HARKER:   So the idea that -- it helps

6   support -- I think it's fair -- I don't think they

7   could use the term hub and spoke because in my

8   experience, as a lawyer, sometimes that term is

9   misunderstood and used by people to do different

10  things.  But I think it's fair to say that this is a

11  hub and spoke conspiracy.  Now Scott Roix and

12  HealthRight were the hub.  They were the entity that

13  the government alleged very clearly in the indictment

14  obtained these prescriptions at the direction of

15  various spokes.  These are the two primary spokes.

16           THE COURT:   Uh-huh.

17           MR. HARKER:   The other unindicted

18  co-conspirators, they're spokes, not hundreds of

19  them, and all the information that they need to know

20  to identify these few people and few companies, they

21  have that information.  Now this shouldn't hang up

22  the Court.  If all the defendants were asking for was

23  a list of the unindicted co-conspirators the

24  government knows of today, we can provide that list.

25  I'll provide it to them.  It's a couple lines long.

```
 1              THE COURT:   Uh-huh.

 2              MR. HARKER:  But that's not list of --

 3      that Motion for a Bill of Particulars as one of the

 4      defense counsel argued today is, in effect, is having

 5      to get us to identify and to narrow our ability to

 6      prove all of the vast array of this conspiracy.  So,

 7      for example, they asked which of the employees did

 8      Larry Smith direct to engage in certain conduct.

 9      Well, I would represent they simply have to go to

10      these folders here that say Reports, and there are a

11      couple of hundred reports in aggregate across all

12      these things.  Those reports are labeled FBI Report

13      Interview Of such and such case, more or less.

14      They're labeled more or less in a very usable format,

15      but those interview reports are also largely

16      searchable.  It is the case -- I forgot to answer

17      Your Honor's earlier questions, "Is everything

18      searchable?"  Not everything is searchable.  Some of

19      the items in this document are paper records that

20      were provided to the government and were scanned by

21      us.

22              THE COURT:   Right.  That's not going to be

23      searchable?

24              MR. HARKER:  That's not -- well, they can

25      OCR it, but what we're talking about there are the
```

hundreds and hundreds of bank records.  I think that
Your Honor can look at this chart, and you can
clearly see that there's just a huge amount of
financial records and claims data and so forth,
banks, banks, banks, banks, banks.  The significance
of that is it just shows the money, but I doubt very
much at trial that these defendants as are alleged in
the indictment are going to contest that they paid
Scott Roix $31 million.  They're going to argue what
it was for, but $31 million, that's a lot of money
for records to substantiate the $31 million was
transferred from various accounts in the possession
and control of these defendants to account for
possession and control of the co-defendant who has
already pleaded guilty.  So for the purposes of
talking about reports, if they want to know who
important patients are, they're in here.  If they
want to know who the important doctors are, they're
in here.  They also mention that there's over 100
doctors that are alleged to have been brought in as
part of the scheme, and they have a list of those
doctors.  It's two pages.  They've got that
information.  They can look in the subpoena response
from HealthRight where the government said -- they
can see the subpoena.  "Give us a list of all the

doctors that you dealt with," and we provided it to
the defendants.  That's searchable, too, by the way,
Your Honor.  It's in an Excel form.  They have all
this information.  A little bit of diligence would
show them exactly where it is in each paragraph of
the indictment that the government has supporting
evidence in these folders.  On top of that, we
offered to provide them assistance in searching for,
for example, audio recordings or the prescription
files if they can't do it.  We haven't received that
phone call, and they can do it.

          Now I'm not going to repeat anything that
I've wrote in my brief.  Does the Court have any
questions for me, Your Honor?

          THE COURT:  No.  I think that's -- I
appreciate your clarification of that.

          MR. HARKER:  Thank you, Your Honor.

          MR. KEHOE:  May I respond briefly, Judge?

          THE COURT:  If you want to, you certainly
can.

          MR. KEHOE:  Certainly, there was no
clarification regarding the roving allegations of the
indictment, be it off an APR or any of those comments
that I addressed in my opening.  If Mr. Harker's idea
is that simply because, you know, $17 million was

defrauded out of this $114 that didn't involve the
defendants, that means that we don't find out who the
rest of these co-conspirators are, I suggest to Your
Honor that he is going to present co-conspirator
testimony involved in these other 17.  If you want
the breakdown, Judge, the 114, the 78, and  the 25
and there was this miscellaneous other group, which
was unidentified people of 17.  Advancing the
argument for some degree that because that number is
small, the identification of the co-conspirators that
he knows and that the grand jury knows is somehow not
that important.  Well, before a jury of twelve, all
the co-conspirators, all the people that are going to
testify as Your Honor well knows are equally
important.  It's not a gauge of the amount that's
involved.  It's the person that's testifying in the
box.  So this separating of the numbers calculation
is a specious argument.  And, Your Honor, we can go
back to the fundamental premise here of not being
surprised at trial.  Why is the government so
reluctant to provide notice now so that we can do our
job and go through this file?  You heard what Mr.
Harker said.  This stuff is not the OCR.  It's not
searchable.  We cannot go in there and put Larry
Smith in there and pull his name out of this array of

documents that he's talking about.  I assume the
government has done that.  I assume that they have a
search mechanism for that.  What is the big, heavy
burden to them to simply give it to us?  That's what
anybody would do in their own civil case.  This is
not tough stuff.  This is not going into what their
theory is.  This is just giving an idea of where
things are, and the argument about HealthRight
answered a subpoena as to what documents that they've
dealt with, what doctors they've used during the
course of that, is that somehow some tacit mission,
that those are all the crooked doctors?  That's the
first time I've heard that.

   MR. HARKER:  Your Honor, the government
hasn't alleged that any doctors are crooked.

   MR. KEHOE:  Well, I didn't -- whoever they
were.  The government has, in fact, alleged in their
indictment that some doctors were complicit.  They
did put that in their indictment.

   Now there's doctor that were complicit.
There are doctors who were apparently -- you know,
according to the indictment that were duped.  This
list that's in HealthRight, who are they?  Are they
the duped ones, or are they the ones that were
complicit?  Oh, we're supposed to just figure it out.

I guess that's what Mr. Harker wants to do, just
figure it out.  There are the names.  You can go out
and do what you want.  But it goes back to -- that's
just one subset of this array of co-conspirators that
are known to the grand jury and are known to the
government.  The documents in -- a case like this
with this kind of complexity over this kind of
geographical area, over this kind of time, it is
simply consistent with Rule 7 in the case law to a
minimum provide us the names of who those people are
so we know when we're going through this, who they
are in the scheme of things.  We're not asking them
for their theories.  We're not asking them for a
heavy lift.  We're simply asking them for that which
they've done already so when we go to trial, we know
what's going on.   And for why -- you know, so some
form will be in the co-conspirator statements seven
days before is really -- depending on how many
witnesses that they intend to present and based on
some of the estimates that were advanced by Mr.
Harker early on, this case is going to be quite
significant.  Getting co-conspirator statements seven
days before a complex case that is scheduled to go on
months will be in my humble opinion, using a legal
term, a completely spiritual experience of little or

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844
56

```
 1   no consequence.  So allowing us at this point to put
 2   our arms around this raging, roving indictment that
 3   the government has, with all due respect, Judge, it's
 4   consistent with Rule 7, and we're just asking for
 5   some minimal materials to advance that using Your
 6   Honor's discretion as to what Your Honor believes is
 7   fair under the circumstances given this array of
 8   information that has been presented to us.  Thank
 9   you.
10            MR. FOSTER:  Judge, may I have a couple
11   minutes?
12            THE COURT:  Yes, you can if you choose to
13   respond.
14            MR. FOSTER:  Thank you.  Judge, I
15   understood the government to say that $114 million of
16   the total $174 million is attributed to these
17   defendants.  So to me, that means that there's $60
18   million that's attributed to other co-conspirators,
19   and I think we're entitled to know the details of
20   that and not just be directed to reports or to
21   folders and say "Find it yourself."  But we are
22   entitled to know who that they think, who it's their
23   position were co-conspirators.
24            Now dovetailing to that, Paragraph K of the
25   Pretrial Order talks about Brady disclosures.  Within
```

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844

14 days of arraignment - that's gone.  That's behind

us - a separate Brady is covered by Janx (sp).  They

are required to give us Brady disclosure.  So does

this mean to say of the $60 million in claims that

people were indicted, was there anyone who said,

"Well, you know, Roix told me this, this and this,

and I believe him."  So they chose not to indict

certain people.  This Brady time has passed.  So if

there are any statements by anybody who's been

interviewed by the government except as covered by

Janx -- we know how narrow Janx is because it has to

be authored or this way the government doesn't turn

over 302.  So if there was nobody who was interviewed

or nobody who the government is aware of that says,

"We all thought we were doing the right thing," among

these folks who were responsible for this $174

million in claims, is there not a single person who's

going to say that?  Because the government, Mr.

Harker said, "Well, you know, we don't think they're

going to argue that this is kind of funny," that's in

the bank records.  He said, "We think they're going

to argue, 'What were we told as good faith?'"  Right.

Good faith.  Good faith -- five seconds, Your Honor.

So do they not have within any of the people

associated with that $174 million, anybody who said

that they were lied to, they were deceived, that they
were operating in good faith as to their dealings
with Mr. Roix?  I suspect -- I would think logically
they do.  So I'd like to point that out.

The last thing, Mr. Harker said or
volunteered to offer the list of the co-conspirators,
alleged co-conspirators, which, again, I would ask
the Court to accept that offer of Mr. Harker and also
the entities, because, again, in the indictment --
the indictment says entities and individuals,
unindicted entities and individuals who were
(inaudible) and in the conspiracy.  So that's a
simple fix for him, and that would be helpful to us,
and I would request that that be provided.  Okay.
Thank you.

MR. HARKER:  All right.  Your Honor, may I
just respond in twenty seconds?

THE COURT:  Do you want to respond for the
individuals?  Is that something you're going to do,
or I'm not -- I'm just inquiring.

MR. HARKER:  Yes, Your Honor.  We can
provide a list of the actual individuals who are
responsible for the balance of the $174 million.

THE COURT:  Okay.  All right.  In addition
to that?

1    MR. HARKER:  Yes.  In addition, Your Honor,
        2    the government is aware of it's Brady obligation.
        3    We take that responsibility extremely seriously.  We
        4    are not aware of any Brady material in this case.
        5            THE COURT:  Okay.  All right.
        6            MR. HARKER:  If we become aware of Brady
        7    material, we will promptly turn it over.
        8            THE COURT:  All right.  Yes, Sir.
        9            MR. SUAREZ:  May I respond to Mr. Harker's
       10    comments?
       11            THE COURT:  All right.
       12            MR. SUAREZ:  Thank you, Your Honor.
       13            THE COURT:  And then we'll take a break
       14    and then we'll get back...
       15            MR. SUAREZ:  I'll be very brief, Your
       16    Honor.  For the record, Eddie Suarez on behalf of Mr.
       17    Palso.  Your Honor, I want to address the issue of
       18    the patients.  I would point out that that was the
       19    first item that was suggested in Exhibit A to our
       20    motion was the identity of the patients who were
       21    allegedly deceived.  As has been pointed out in the
       22    indictment on Page 2, the government or the grand
       23    jury alleged that the conspiracy deceived tens of
       24    thousands of patients.  So to identify who these
       25    deceived patients are is very important in order to

defend this case. If we look at the indictment, a number of individual patients are identified in individual counts. Just using rough numbers, Your Honor, it looks somewhere approximately -- there are 29 counts of individual patients. Those patients are identified in the indictment by initials. So if I understand the government's position correctly, and perhaps I don't, but if I understand it correctly, in order for me to review the recordings of those patients, I would have to go to this master list. Let's just take the first four in the indictment at Page 37 or the first five, who are identified with the initials J. L. So we'd have to look at this master list that presumably has tens of thousands of phone calls. I'd look for those that match the initials J. L. and identify the phone number for them and then be able to go through the recordings just to see if I've got the right J. L. So I point that out to illustrate just how difficult, if not impossible, it would be to defend against the allegations of patients who were deceived if we don't know who those patients are.

            Your Honor, Ms. Zysk has a couple of points she wanted to make to the Court in response to Mr. Harker. If she could do so on behalf of Mr. Palso,

we'd appreciate that.

THE COURT:  Do you want to talk, too?

MS. ZYSK:  Yes, Your Honor.

THE COURT:  Come and join the party.

MR. SUAREZ:  Thank you, Your Honor.

MS. ZYSK:  Thank you, Your Honor.  Rachel Zysk for Mr. Palso.  The one thing I wanted to make clear is this is not a discovery motion.  This is like charge conduct.  So while the government's offer of providing us with a two-line list of who they alleged to be 45 percent of this conspiracy doesn't really get to the heart of the issue, and that is what has the government charged?  What do we have to provide at trial?  The discovery only matters for purposes of us understanding what the charges are to choose limited discovery in federal criminal cases. It's not about the discovery itself, and the searchability and the ability to review the discovery really goes to what is the government alleging occurred and because of -- is the Bill of Particulars limited to the government's proof?  Because that's much more important than a two-line list, "Here are a couple of our co-conspirators."  We need to know exactly what we (inaudible) at trial.  We need to know what, once we are able to search the discovery,

what we search for, what these co-conspirators are
alleged to have done, what we are alleged to have
done, what the government alleges is illegal? If
Scott Roix is the hub of this conspiracy and some
person off in Texas that we've never met is another
hub, how are we supposed to search discovery for his
name? So a written Bill of Particulars limits the
government's allegations to what has occurred, and
that's what we really need to prepare for trial.

THE COURT: Okay.

MS. ZYSK: Thank you.

THE COURT: Okay. Well, let's take a --
do you want to say something?

MR. FOSTER: I just want to ask one point
of clarification that's been our concern. I
understood that Mr. Harker volunteered to provide a
list of the individuals and the entities that
comprise that remaining dollar amount of the claims,
but we had asked for -- and I thought that initially
he had volunteered to give the names of the
unindicted co-conspirators. So the entities that are
responsible for that other $40 million and those
people who are responsible for that additional money
is not the whole set of unindicted co-conspirators.

THE COURT: Okay. That's fine, and I'm

1  just going to rule and let you know the argument --

2  I'm not going to tell him (inaudible) voluntarily,

3  just get something to moot the issue, but if it's not

4  enough, then I'm just going to address the motion

5  that you all have asked in the Order.

6        MR. FOSTER:  I didn't mean to be...

7        THE COURT:  Well, he's not -- what he's

8  giving you is not going to the issue because there's

9  more you wanted to be turned over.  Right?

10        MR. FOSTER:  I thought there were two

11  offers.  I thought at the beginning he said that he

12  could provide us a list - it would be a short list -

13  of the unindicted co-conspirator.

14        THE COURT:  Okay.  I tell you what.  Why

15  don't you all talk about this?  Why don't you all see

16  if you can -- why don't you talk about whether or not

17  you can do the -- if you can't, that's fine, but I

18  don't want to get into the, "He's not giving me

19  enough, or he's not given me, you know, what I asked

20  him for.  We asked for this."  Because it makes more

21  since to do what you're -- you're willing to give him

22  some of this.  Talk about what you're willing to give

23  him.  If you can't agree to it, that's fine.  That's

24  what I'm here for.  And then we'll be back here in

25  about ten minutes.

1          MS. OTTINGER:  All rise.  Court's in

2    recess.

3          (OFF THE RECORD.)

4

5          MS. OTTINGER:  Come to order and be seated.

6    Court is now in session.

7          THE COURT:  Sorry for the delay there.  I

8    had one or two other matters.  All right then.  Let's

9    hear -- the next motion is the Motion to Strike

10   Surplusage in the indictment.  And let me make an

11   observation first before we spend a lot of time

12   arguing because it might, it might affect your all's

13   position on this.

14          It's my understanding in dealing with Judge

15   Greer and when I was a practicing lawyer and as a

16   magistrate judge now, on a case of this nature where

17   the indictment is as long as it is, I don't believe

18   he's going to read the indictment or give it to the

19   jury.  Let me ask Mr. Harker.  Is that your

20   understanding, too?

21          MR. HARKER:  Your Honor, I don't know the

22   answer to that question.

23          THE COURT:  I think he summarizes the

24   allegations and the counts.  He goes through and does

25   that for them and then has a special verdict form

before him, and I don't think he'll be presenting the
indictment to the grand jury at all.

MR. BOSCH:  Your Honor, Don Bosch for what
limited enlightenment I can provide.  I think you're
correct about what Judge Greer does even on medium
sized indictments.  This is a large one.  He'll
summarize it and then give the appropriate
instruction in verdict form to the jury.

THE COURT:  Yeah.  That's what I -- that's
my understanding, too.  So that might help you a
little bit because I think that may be a moot issue
in some of these ideas of striking surplusage in the
indictment, but go ahead.

MR. KEHOE:  Yes, Judge.  It may with some
of the ancillary matters that go towards the end of
the brief, but to the extent that, for instance, we
have money laundering items set forth in the
indictment and...

THE COURT:  Why don't you go ahead and
argue that?

MR. KEHOE:  Okay.  Obviously, we're arguing
this under 7B, Judge, and throughout the indictment
there are comments about the movement of money that
is described as money laundering, the traditional
money laundering.  I know money laundering is a very

loaded term and goes directly to Section 1956 and 1957.

THE COURT:  But if it's part of the conspiracy is what they're saying. is that not relevant?

MR. KEHOE:  No.  If -- what he's saying is that they are moving money to somehow conceal it.

THE COURT:  Right.

MR. KEHOE:  Okay.  That -- can they argue that they're moving money to conceal, where that money came from, etcetera?  They can argue that, but to call it something that is a separate crime, i.e., money laundering without going through what money laundering is because this under 1956 or 1957 is neither a financial transaction or a monetary transaction, and I am sure that the initial elements of 1956(a)(1) are not set forth in this indictment and certainly nothing in 1956(a)(1) nor, of course, (a)(2), nor is it in 1957.  So what we're doing here is without going through this definable term, money laundering, which is under 1956 and 1957 well laid out and case law is replete on it, the government just throws it in there like a little hand grenade throughout it all to say, "Look," because they know full well -- they know full well that a jury is going

to react to money laundering, although there is no
crime set forth in this indictment on money
laundering. Now there is no charge. I suspect that
counsel decided not to bring a money laundering
charge or the money laundering section of the
Department of Justice declined to allow the U. S.
Attorney's office to bring a 56 or 57 charge. Be
that as it may, it's not there, but it's still in
there as these little mine fields without anything
else other than this description that is intended to
prejudice the jury and doesn't advance any knowledge
for the jury because money laundering, qual
(phonetically) money laundering under 1956 and 1957
is simply not listed as one of the charges. I mean
we know why the government's put that in there,
Judge. We know full well that it is there to alarm
the jury that this is somehow a money laundering
issue when it's not. If they want to argue during
the course of the evidence and argue from the
evidence that somehow the defendants concealed money
or moved money, well, that's the evidence that comes
in. But to describe it as money laundering is
improper. It would be the function -- why not just
put embezzlement through all this even though you
don't have an embezzlement charge or some other, you

know, volatile description.  That's what's going on

here.  That's why they're doing this, and that's why

the courts take those terms and they strike them

because of those particular reasons.  There's no

charge of 56 or 57 charge.  There's no laying out of

the elements of 56 and 57, 56 under (a)(1) or (a)(2),

certainly not (a)(2) because it's international, but

under (a)(1) and certainly nothing under a 1957

charge to allow any jury to come to a conclusion

about money laundering, which, of course, is

indicative of the fact as to -- or why, I should say,

the government didn't bring a 56 or a 57 count.  And

that's the reason it's there.

THE COURT:  So when Judge Greer summarizes

it, it may be -- it is your position that he should

summarize it and say that they were money laundering?

MR. KEHOE:  What I'd say to the judge is

that what is to preclude Mr. Harker from standing in

front of the jury and say, "Well, on Paragraph such

and such of the indictment it describes money

laundering when the defendants at X, Y and Z, and

it's right here in the indictment, right here hands

down by the grand jury."

THE COURT:  They won't have it.  They

won't have the indictment.

MR. KEHOE: Yeah. But he can still read it. He can still refer to something that is in the indictment. Whether or not they have it, I mean both sides will refer to the charging document during the course of both opening statement and closing. So...

THE COURT: Okay. All right. So you want money laundering struck out?

MR. KEHOE: Yes.

THE COURT: All right.

MR. KEHOE: Money laundering is stricken out. I mean the other issue that is perplexing, of course, is something I alluded to during the argument on the Bill of Particulars, and that has to with the inflated AWP's. These defendants, regardless of the allegations, have nothing to do with setting the average wholesale price. That is set by third parties, and when a particular item comes into a PBM, it auto-populates that with what the AWP is.

THE COURT: So what do you want me to do with that?

MR. KEHOE: Strike that because it's...

THE COURT: Strike it anywhere it says AWP?

MR. KEHOE: Of course.

THE COURT: And what goes in its place?

MR. KEHOE:  That's something that the
government asked because what they have done is they
have decided to, mistakenly or whatever, they have
decided to incorporate a definition in here, AWP,
which doesn't exist, and lay it at the feet of these
defendants when they have nothing to do with the AWP.

THE COURT:  I think your argument is that
AWP is inflated and AWP is a misnomer because they
actually bought it at a discount from the AWP and
they got reimbursed in the AWP records.  Is that
right?

MR. KEHOE:  No, Judge.  What I'm saying to
you is that the term "inflated AWP" is just wrong.

THE COURT:  Well, what is -- well, I mean
if you agree, agree -- my understanding is your
argument we have agreed was that the reason it was
wrong is because in actuality we got a discounted AWP
rate and then got reimbursed at an AWP rate.  Is that
right or wrong?

MR. KEHOE:  No, not necessarily, no.

THE COURT:  Well, correct me on that.
What's your position?

MR. KEHOE:  The wholesaler buys a product,
whatever the product happens to be, and they sell it.
There's an AWP for this product.  The PBM's don't pay

the AWP.  Why?  They pay something less because they're making a profit.  So they're not going to pay out at the AWP.  But what that AWP is set at is set by a third party.  It's the functional equivalent of, you know, changing the interest rate for the Fed.  I mean you just can't...

THE COURT:  Will you argue that to the jury then?  Can you just say, "Well, this is what their whole theory of the case is.  It's a shame because they've got their whole charge going on, and here, this is how in actuality the AWP works"?  Why isn't that a factual issue that...

MR. KEHOE:  Well, the reason is, Judge, it is not only relevant, but it is prejudicial.  If...

THE COURT:  Well now, what do you mean?  How is that, you arguing that the way the government has -- how is that prejudicial?  I'm not...

MR. KEHOE:  Because the government is advancing a term which categorically is incorrect.

THE COURT:  Okay.

MR. KEHOE:  The government is advancing something in there that we have to talk to you about here, Judge, that is just wrong - with some argument that these defendants had something to do with setting the AWP, and they do not.  They have nothing

to do with it.  And you add onto that that they made
money by inflating the AWP is clearly more
prejudicial.  So you take something about which they
have no control, and then you add the adjective
"inflated" to it - again, something like money
laundering - to inflame the jury.  Not only are you
laundering money, you're inflating the AWP.  I mean I
think it's incumbent upon...

THE COURT:  But the defense to it is we
had nothing to do with that.

MR. KEHOE:  Well, certainly, Judge --
certainly, Judge, there is an argument similar to the
argument that I'm making to you, but I do think that
moving ahead with the charged indictment, for the
Court to consider something that's in this charged
indictment that is incompletely wrong is just
incorrect.

THE COURT:  Okay.

MR. KEHOE:  That's causing something that
-- an inflated AWP and putting it at the feet of
these defendants is just completely wrong, and
allowing that to move forward, as we move forward in
this -- so we have to address it in front of the
jury.  First of all, Your Honor, it's unnecessary.
Secondly, it's an irrelevant allegation given the

fact that they had nothing to do with it. Thirdly,
similar to having the government argue money
laundering is prejudicial...

THE COURT: Okay.

MR. KEHOE: ...to have it ringing around
with the jury that this inflated AWP is in the
indictment.

THE COURT: Okay. All right. So knock
out the inflated AWP, the money laundering.

MR. KEHOE: And there is the last issue,
Judge. There's any number of comments that are set
forth, you know, in the indictment that make this
indictment appear, you know, like it's global. You
know, there are no holds barred here. You know,
protect your little ones because here comes this
conspiracy, that it's known an unknown, and it's
people, other people involved, other pharmacies, and
it's happening elsewhere, and they're involved in a
variety of schemes. There are a number of items that
we listed in our motion that clearly are put in the
grand jury simply to expand this out well beyond what
this case actually is, which is interesting because
even while they're putting these expanded things out
like there's a variety of schemes in '76, and this
happens, it's happening elsewhere. You know, in

Paragraph 1, 32, 94, 96, 98, 100, all those issues
which, you know, are in the indictment that we're
trying to get some Bill of Particulars on, but
nevertheless, it's still in the indictment.  So there
has to be some consideration, Judge, of striking
those items about which it gives a misperception of
the range and scope of this conspiracy.

THE COURT:  And just so that I understand
what you're saying, you're referring to the
specifics, the specific items that you're asking me
to strike?

MR. KEHOE:  Right.

THE COURT:  I believe is the...

MR. KEHOE:  We have them listed in there,
Judge.

THE COURT:  Yeah.  Among other things...

MR. KEHOE:  Right.

THE COURT:  ...and you have them listed on
Page 9 of Document 104 as to exactly what you want...

MR. KEHOE:  Correct, Judge.

THE COURT:  ...struck as far as other
persons and entities known and those kind of things?

MR. KEHOE:  Yes, Your Honor.

THE COURT:  Okay.  I see what you're
saying.

MR. KEHOE: Okay. That's -- without
belaboring the point, Judge, that's the argument.

THE COURT: Perfect.

MR. KEHOE: I'll turn it over to my
colleagues unless anybody else has anything.

THE COURT: If anybody else would like to
argue, you certainly can. I'm not going to...

MR. SUAREZ: Judge, I'm still blown away by
his argument. Thank you.

MR. ___: Nothing here, Sir.

MR. ___: Nothing, Your Honor. Thank you.

MR. ___: No, thank you.

THE COURT: All right. Mr. Harker -- I
mean Mr. Roach. Were you equally blown away by the
argument?

MR. ROACH: Yes, Your Honor. I'm blown
away. Good morning, Your Honor. Bill Roach from the
Knoxville office. I'll go straight to the money
laundering allegations in the indictment. Your
Honor, as I pointed out in our response to the
motion, that allegation to money laundering is
relevant to the conspiracy. It shows that the
defendants were attempting to conceal their purchases
of the medications and the reimbursements. They were
trying to conceal that from the pharmacy. To do

that, they had to implement and devise a money

laundering scheme so that the PBM's did not discover

that the patients were not paying the co-pays.  Okay?

THE COURT:  Well, did the PBM's audit them?

What was the real point behind them needing to

conceal?

MR. ROACH:  That's exactly right, Your

Honor.  The PBM's could audit them.  The PBM's did

audit them, and the PBM's did eventually terminate

some of the pharmacies for that specific issue, and

that's what we intend to prove at trial.

THE COURT:  Okay.

MR. ROACH:  So that we're going to show

that this money laundering scheme that the defendants

developed, that the intent of that scheme was to

deceive the PBM's, Your Honor.

THE COURT:  They make a point that, "Well,

does it -- you did indict him for money laundering,

and, therefore, you shouldn't be able to say that

that money was laundry money."  That looks like the

essence of one of their arguments.

THE COURT:  That is, Your Honor, but with

all due respect, that misapprehends the legal

standard here.  The Sixth Circuit has set down the

legal standard where if we have an allegation in the

indictment, if that allegation is relevant and we
intend to prove it, then it cannot be stricken under
the Sixth Circuit deprescuit (phonetically).  It has
to be both irrelevant, and it has to be prejudicial.
Now we don't even get to the prejudice inquiry here,
and that's what the Sixth Circuit has held in the
cases that I cited in my response because the
allegation of money laundering is relevant, Your
Honor.  And that argument, moving into the second
point, only inflated AWP medications.  That applies
equally to the inflated AWP, to that allegation.  We
included that in the indictment because that's
exactly what we intend to prove at trial.  We intend
to prove that the conspiracy set out to -- or part of
the conspiracy was to set out to isolate these
medications where the AWP price was spread between
the AWP and the usual and customary price at which
the pharmacies paid for the medications.  The
defendants isolated the medications that had the
highest spread.  That's what we're going to show at
trial.  That's what we allege in the indictment, and
because that allegation is relevant, because it shows
that the purpose of the conspiracy was financial
gain, that's the relevance of the inflated AWP
medication, the allegation in the indictment, Your

Honor.

THE COURT:  Okay.  So you've heard the
defendants say that this inflated AWP, there was no
such thing.  It's a wrong term.  What's your response
to that?

MR. ROACH:  Your Honor, I would say two
things.  I would say, Number 1, it's not a wrong
term.  It's exactly what happened here.  The word
"inflated" is just our description  of the difference
between the AWP price, which is an industry-reported
price, and the usual and customary price.  Now we're
going to show that the medications that they selected
that they isolated, that they test built for, that
they fished for -- we're going to show that the
spreads on those medications were some of the highest
spreads that you could find in the pharmaceutical
industry.  Okay?  That's why those -- that's why we
say that it's an inflated AWP, because the AWP price
is inflated over the usual and customary price, Your
Honor.  That's why it's relevant, because it shows
that the intent of the conspiracy was financial gain.

Now to the second point...

THE COURT:  Is that, is that illegal?  I
mean is that -- what I'm trying to figure out is if
you have -- they don't set the AWP price?

1    MR. ROACH:  That's correct.

2    THE COURT:  Okay.  So we've got that set

3    out there by a third party, and then they -- it looks

4    like your allegation so I'm understanding...

5    MR. ROACH:  Right.

6    THE COURT:  You've got the -- what your

7    allegation is the defendants go and find those

8    particular medications that have these third party

9    established AWP's and then compare them to the

10   normal, customary reimbursements?

11   MR. ROACH:  Right.

12   THE COURT:  Is that right?  And then if

13   they're large enough, they'll encourage the doctors

14   or however that scheme would be...

15   MR. ROACH:  That's correct.

16   THE COURT:  ...we will get them to

17   prescribe these medicines...

18   MR. ROACH:  Right.

19   THE COURT:  ...because we're going to make

20   a big...

21   MR. ROACH:  Well, Your Honor, there's

22   nothing inherently illegal about trying to make a

23   profit.

24   THE COURT:  Right.

25   MR. ROACH:  But if you deceive doctors, if

you deceive patients, if you deceive the PBM's into

reimbursing for medications that were not necessary,

that the patients didn't want, that the doctors

didn't know that the patients were requesting certain

medications, that's where it turns into what we

allege in the indictment, Your Honor.  And so that's

-- and that's exactly why the allegation of an

inflated AWP medication is relevant, Your Honor.

THE COURT:   Okay.

MR. ROACH:  Unless Your Honor has any

further questions about the third category, I would

just say that none of those allegations, Your Honor,

in the indictment are prejudicial.  The conspiracy --

we do mention others unnamed by the grand jury.  I

think that's customary practice, for the grand jury

not to name unindicted co-conspirators in the

indictment.  And there was some argument about that

during the Bill of Particulars when Your Honor was

asking questions about the Bill of Particulars

motion, Your Honor, but I think the underlying point

for our case in the Motion to Strike is that none of

those, none of those allegations, none of the

inclusion about language the indictment is

prejudicial, Your Honor, and for that reason, the

motion in its entirety should be denied.

THE COURT: Okay.

MR. ROACH: Thank you.

THE COURT: All right. Thank you, Mr. Roach.

MR. KEHOE: May I respond briefly, Judge?

THE COURT: Absolutely.

MR. KEHOE: We go back to the money laundering aspect first, Judge. I mean, yes, the Sixth Circuit case said, you know, if it's prejudicial, it shouldn't be stricken. Most indictments are prejudicial, Judge. I mean let's be frank. I mean people aren't there for, you know, going to the spa. You know, they've been indicted for something. So it's per se prejudicial, but it's got to be relevant. And what they're arguing is that they are saying that this money was concealed and concealed from the PBM's, and they're calling it themselves money laundering, and it's not money laundering. If you look at 1956 and 1957 as Congress has defined it, it is not money laundering. And what they're trying to do is put a round peg in a square hole. We're not before Your Honor advancing the theory that we want to put a fence around the government's evidence on concealment; that they were concealing where money was going for whatever reasons

1    the government is advancing.

2            THE COURT:   Well, let me ask you.  What is

3    money laundering?

4            MR. KEHOE:   Well, it's a variety of

5    different things.  1956 is the taking of specified

6    unlawful proceeds and using it to advance that

7    specified unlawful activity, to evade taxes or to

8    otherwise promote the activity.

9            THE COURT:   So if you had specified

10   unlawful activity for fraud...

11           MR. KEHOE:   No.  It's got to be -- yeah.

12           THE COURT:   ...I mean would that be --

13   would that -- it looks like to me that's what this

14   conspiracy is about is fraud; that they're saying

15   that, hey, they got this money from a specified,

16   unlawful activity is what Mr. Roach has described,

17   and then try to secrete the money from being, you

18   know, being detected based on the audits that the

19   PBM's were engaged in.

20           MR. KEHOE:   Well, let's stop at the first

21   thing.  What the SUA is in those proceeds, you have

22   to prove that the proceeds are, in fact, coming from

23   a specified, unlawful activity.

24           THE COURT:   Okay.

25           MR. KEHOE:   You have to prove that.  That's

Step 1.  And then you have the promotion, tax and
moving on the ongoing activity of the enterprise.  So
I mean all of those issues -- just identifying that
information is, is required.  You've got to say this
is from SUA.  Why is that important?  Why is that
important?  Because it ain't true, which is also
money laundering.  I'm talking about 1956(a)92).  You
don't have to have money from a specified, unlawful
activity.  1956(a)(2) only requires that money be
moved nationally or internationally across borders
and that that money is used to promote.  So that's
much different between (a)(1) and (a)(2).  So it's
the defining and being able to prove not only the
SUA, specified unlawful activity, pardon the acronym,
the SUA, but that these are proceeds from the SUA
before you take the additional steps.  It's crucial
depending on whether or not it's an (a)(1) or (a)(2).
They don't do that.  They just call it money
laundering and say, "Hey, this is money laundering.
Why?  Because you guys are taking money, and you're
concealing it from the PBM's."  If I make money
legitimately and I'm concealing it from the PBM, is
that money laundering?  No.  Clearly, clearly on the
worst case scenario because it's not an SUA.  It's
not, you know, proceeds from a specified unlawful

activity.  You know, Judge, this isn't complicated
stuff.  You know, I spent the good majority of three
years dealing with just putting these statutes
together and willy-nilly just talking about what
something is, a SUA and the proceeds and promotion,
etcetera under 56(a)(1) and 56(a)(2) is an
evidentiary derivative product, and they don't have
it.  What they want is some kind of sizzle factor.
They want to cost this -- they want to call this
money laundering without charging it and without
going through all the elements, but they want to come
in here and argue that somehow somebody concealed
some money from them.  You know, I don't think at
this point -- during this point -- we can argue that
at trial, but at this point there's no, there's no
basis upon which for us to curtail the concealment
argument...

        THE COURT:  Okay.

        MR. KEHOE:  ...as evidence of a conspiracy.
But calling it money laundering, qua money laundering
on a 1956 or a 1957, for that matter, which, you
know, we haven't really talked about that much.  It
is a much more complex matter concerning the source
of those proceeds and what those proceeds are
designed to do as required by the statute, and they

haven't done it.  They just want to throw these
little hand grenades in throughout the course of this
indictment to prejudice defendants and have the
jurors if they ever hear it, when they read this
during opening and closing, "Oh, my heavens to Betsy,
there is money laundering going on.  On top of
everything else, they're money laundering."  That's
the reason for it, Judge.  That's the reason for it.
That's inflated, inflated AWP.  Counsel said inflate
it over customer improper.  What does that mean?
Inflate it over customer improper.  Customer
improper?  We didn't even set the AWP.  These
defendants have nothing to do with the AWP.  Your
Honor hit the nail on the head.  AWP and the PBM's
are auto-populating the purchase based on that AWP,
and they're buying money -- buying the product and
making a profit based on that.  That's America.
That's not a crime.  They don't set the AWP.  If
they're not setting the AWP, how can they inflate it?
And that's what they're charging in the indictment.
If they want to come up with some other scheme that
they did something wrong with that, that's fine, but
it's got nothing to do with the definable term of
AWP.  If they don't have anything to do with it,
certainly they can't inflate it.  That's basically --

**Barringer Court Reporting**
**P.O. Box 8035, Gray, TN - 423-477-7844**

```
 1   and then, of course, Judge, that does not, again, put

 2   a fence around I'm sure the argument that they're

 3   going to advance, that doctors were deceived and

 4   other people, patients were deceived, etcetera.

 5   That's a different factual, evidentiary scenario.

 6   We're just talking about this misuse of terminology

 7   that is not only prejudicial.  It's extremely

 8   irrelevant.

 9              THE COURT:   Okay.

10              MR. KEHOE:   Thank you.

11              THE COURT:   Thank you.  Does anybody else

12   want to be heard on rebuttal for that?

13              MR. SUAREZ:  No, Your Honor.  Still blown

14   away.

15              THE COURT:   All right.  Well, that will

16   conclude the hearing, I believe.  Anything else that

17   needs to be brought up?

18              MR. FOSTER:  Yes, Sir.  Mr. Harker and I

19   did have the opportunity to discuss that issue.

20              THE COURT:   Yes.  Yes.  Tell me about

21   that.

22              MR. FOSTER:  And I think Mr. Harker will

23   explain to the Court what we discussed.

24              THE COURT:   Okay.

25              MR. HARKER:  Your Honor, two points to Mr.
```

**Barringer Court Reporting**
P.O. Box 8035, Gray, TN - 423-477-7844
87

Bosch's points. One of them, I just want to make
sure that the defendants understand in the indictment
that the reason these patients' initial are automized
has nothing to do with us preventing -- we're happy
to provide them a list of who these patients are.

THE COURT: Okay.

MR. HARKER: That's only because it's
protected health information.

THE COURT: Right.

MR. HARKER: On the issue that Mr. Foster
raised, the government's position is that there is a
difference between the unindicted co-conspirators who
make up the balance of the $174 million on the one
hand and all of the unindicted co-conspirators. And
in particular, there's one person who should probably
have been indicted as part of this conspiracy because
he's on one of these two spokes. He doesn't happen
to be on Mr. Foster's spoke. He happens to be on Mr.
Smith's spoke. That person is the subject of an
ongoing investigation. I think everybody in this
room probably knows who that person is. The
government is willing to identify by name the
entities and persons who make up the balance of the
$174 million to all the defendants. We are not
willing to identify the name of that person to make

it explicit as to who is the subject of an ongoing

investigation, and that person is not responsible for

any more money.

4                    THE COURT:   Okay.

5                    MR. HARKER:  If that makes sense.

6                    MR. KEHOE:  With all due respect, Judge, I

7      look forward to be enlightened because I represent

8      Mr. Smith, and I don't know who he's talking about.

9                    THE COURT:   All right.  Very good.  All

10     right.  So you're going, you're going to provide the

11     ones that you agree to provide except for that one

12     individual?

13                   MR. HARKER:  Yes, Your Honor.  The one that

14     we -- when we say unindicted co-conspirator, what I'm

15     talking about is people that the government believes

16     that we could prove a case against with the evidence

17     we know about now.

18                   THE COURT:   Okay.  Mr. Foster?

19                   MR. FOSTER:  Yes.  If he's going to provide

20     that description of individuals, I think that

21     satisfies my request.

22                   THE COURT:   Okay.  All right.  Okay.

23     Anything else we need to take up?  I appreciate your

24     all's time.  It's 11:25, and appreciate the argument

25     and your all being here today.

1          ALL:  Thank you, Judge.

2          MS. OTTINGER:  All rise.

3    THIS COMPLETES ALL MATTERS PRESENTED IN THIS HEARING.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          Exhibit No. 1, Excel Record and Key, Evidence Folder

2     Contents.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Barringer Court Reporting**

1    Exhibit No. 2, Three printouts of screen shots, phone
2    numbers.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1      Exhibit No. 3, Subpoena, Synergy Recordings, Batch 8.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    Exhibit No. 4, Synergy Recordings, Batch 8

2    (3166485998).

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

I, C.D. Neal, Notary Public and Court Reporter, Barringer Court Reporting, hereby certify that the foregoing is a true and complete Transcript of the Motion Hearing in the case of UNITED STATES OF AMERICA versus ANDREW ASSAD, ET AL as heard in United States District Court, Eastern District of Tennessee at Greeneville on the 3rd day of April 2019.

WITNESS my hand and official seal at office at Gray, Tennessee, this the ___ day of _____, 2019.

BARRINGER COURT REPORTING

By: _____
NOTARY PUBLIC

My Commission Expires:  September 30, 2020.

**Barringer Court Reporting**
**P.O. Box 8035, Gray, TN - 423-477-7844**
95